UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
KEVIN HEFFERNAN,

                                      Case No. 07 CV 11260 (WCC)

                      Plaintiff,

        -against-

FRANK G. STRAUB, individually, and in his capacity as
Commission of Public Safety for the City of White Plains,
N.Y., RICHARD LYMAN, individually, and in his
capacity as Chief of the City of White Plains Fire Bureau,
Department of Public Safety, RICHARD HOULIHAN,
individually, and in his capacity as Deputy Chief, White
Plains Fire Bureau, Department of Public Safety,
VINCENT ROBERTO, individually and in his capacity as
Deputy Fire Chief, White Plains Fire Bureau, Department
of Public Safety and the CITY OF WHITE PLAINS, New
York,

                      Defendants.
--------------------------------------------------------------------X

## MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO DISMISS

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
Attorneys for Defendants
199 Water Street, Suite 2500
New York, New York 10038-3516
(212) 232-1300

Ivan D. Smith, Esq.
Maureen M. Stampp, Esq.
*Of Counsel*

4823-2152-5506.1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
KEVIN HEFFERNAN,

Case No. 07 CV 11260 (WCC)

Plaintiff,

-against-

FRANK G. STRAUB, individually, and in his capacity as
Commission of Public Safety for the City of White Plains,
N.Y., RICHARD LYMAN, individually, and in his
capacity as Chief of the City of White Plains Fire Bureau,
Department of Public Safety, RICHARD HOULIHAN,
individually, and in his capacity as Deputy Chief, White
Plains Fire Bureau, Department of Public Safety,
VINCENT ROBERTO, individually and in his capacity as
Deputy Fire Chief, White Plains Fire Bureau, Department
of Public Safety and the CITY OF WHITE PLAINS, New
York,

Defendants.
-------------------------------------------------------------------X

## INTRODUCTION

Defendants Frank G. Straub ("Straub"), Richard Lyman ("Lyman"), Richard Houlihan

("Houlihan"), Vincent Roberto ("Roberto"), and the City of White Plains (collectively

"defendants" or the "City"), by their attorneys, Lewis Brisbois Bisgaard & Smith LLP, submit

this Memorandum of Law in support of their motion to dismiss the complaint in its entirety

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

On or about December 14, 2007, plaintiff Kevin Heffernan ("plaintiff" or "Heffernan")

filed the Complaint in this action (the "Compl."). (A copy of the Complaint is annexed as

Exhibit "A" to the Affirmation of Ivan D. Smith dated March 19, 2008 ("Smith Aff.").

In the Complaint, plaintiff alleges three causes of action pursuant to 42 U.S.C. § 1983. In the first and second causes of action, plaintiff alleges that defendants engaged in retaliatory conduct that violated his rights as guaranteed by the First Amendment to the United States Constitution. In the third cause of action, plaintiff alleges that defendants treated him disparately in violation of the Equal Protection Clause of the Fourteenth Amendment.

Defendants requested and the Court granted permission to file this pre-answer motion, requesting dismissal of this action pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

## STATEMENT OF RELEVANT FACTS

Plaintiff is employed as a fire lieutenant with the White Plains Fire Bureau, Department of Public Safety of the City of White Plains (the "Department"). Plaintiff is the vice president of the Professional Fire Fighters Association, Inc. ("PFFA"), Local 274, I.A.F.F., AFL-CIO and the duly appointed chairman of the PFFA's Health and Safety Committee. (Compl. ¶ 3)  Straub is the Commissioner of the Department; Lyman is the fire chief, Houlihan and Roberto are deputy chiefs of the Department. (Compl. ¶¶ 4-7)  Lawrence Toglia ("Toglia") is a fire lieutenant with the Department. (Compl. ¶ 12)

On April 20, 2005, the City of White Plains conducted "live fire" training involving fire fighters and equipment. (Compl. ¶ 9) During the course of the training a real fire broke out and Roberto directed that the live fire training cease and the men and equipment at the drill site "go available." Plaintiff, by radio transmission, cautioned that certain fire fighters who were requested by Roberto to "go available" were fatigued. (Compl. ¶¶ 10-11)  (See transcript of radio transmission of April 20, 2005. A copy of the transcript is annexed as Exhibit B to Smith Aff.); (see also plaintiff's written statement to Lyman, dated April 20, 2005. A copy of the statement is annexed as Exhibit C to Smith Aff.)

The relevant job specification for the title of fire lieutenant, which was in effect in April 2005, provides examples of the work of a fire lieutenant. It states that the title, among other duties, "operates portable radio and/or other radio equipment at fire or rescue scenes, and makes reports to Dispatcher of condition and unit status". (See copy of fire lieutenant job specification annexed as Exhibit D to Smith Aff.) The Rules and Regulations for the Government of Officers and Members of the Bureau of the Fire Department of Public Safety, City of White Plains (the "Regulations"), provides that each member shall "[p]romptly notify the Fire Alarm Dispatcher or Deputy Chief on duty of any inability to report for duty at the time or place required." (See § 129(3) of the Regulations; a copy of which is annexed as Exhibit E to Smith Aff.)

On or about July 29, 2005, defendants preferred disciplinary charges against Heffernan and Toglia accusing them of failing to timely respond to Roberto's orders to "go available". The disciplinary charges preferred against Toglia and Heffernan were identical except that Heffernan's charges contained an additional charge where defendants charged him with violating the Regulations by making an "inappropriate radio transmission advising Ross Street command that drill school companies are fatigued during a working fire." ("Charge VI") (Compl. ¶¶ 12-13)

Toglia settled the disciplinary charges preferred against him, resulting in the forfeiture of one day's pay. (Compl. ¶ 15) The disciplinary charges against Heffernan did not settle and proceeded to a disciplinary hearing. Defendants, at the hearing, withdrew the charge regarding Heffernan's radio transmission. The disciplinary charges against Heffernan that proceeded to a hearing were identical in every respect to the disciplinary charges that defendants had preferred against Toglia. (Compl. ¶¶ 16)

On April 23, 2007, the hearing officer issued the Amended Hearing Officer's Report and Recommendation (the "Report"), finding Heffernan guilty and recommended a thirty day suspension without pay. (A copy of the Report is annexed as Exhibit F to the Smith Aff.) On April 24, 2007, Straub adopted the Report and issued a final administrative determination imposing upon Heffernan a thirty day suspension without pay, to commence on April 26, 2007 through and including May 25, 2007. (Compl. ¶¶ 16-17)

## ARGUMENT

Plaintiff asserts three causes of action pursuant to 42 U.S.C. § 1983. First, plaintiff claims that defendants' conduct violated his right of free speech and right of association guaranteed by the First Amendment. Second, plaintiff claims that defendants treated him disparately in violation of the Equal Protection clause of the Fourteenth Amendment.

Plaintiff's First Amendment claims fail because (1) plaintiff's speech is not constitutionally protected because the radio transmission was made within his official duties as a fire fighter and fire lieutenant and the Constitution does not insulate that type of communication from employer discipline; and (2) plaintiff is unable to establish a causal link between the radio transmission and thirty day suspension without pay.

Plaintiff's cause of action pursuant to the Equal Protection clause of the Fourteenth Amendment is equally flawed. To succeed on a § 1983 equal protection claim against a public employer, claiming selective treatment, plaintiff must and will be unable to show that defendants treated him differently from similarly situated individuals. Plaintiff's inability to meet these standards dooms his equal protection claim.

## POINT I

## APPLICABLE LEGAL STANDARDS

In reviewing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a district court "must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir. 1994). The Supreme Court has held that on a motion to dismiss, the issue is "whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Davis v. Scherer, 468 U.S. 183 (1984); Patane v. Clark, 508 F.3d 106, 111-12 (2d Cir. 2007) (accord). In order to withstand a motion to dismiss, a "complaint must plead enough facts to state a claim for relief that is plausible on its face." Id., (quoting Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1974 (2007).

When considering a motion to dismiss for failure to state a claim, a district court may consider the facts as set forth in the complaint, documents attached to the complaint and any other documents incorporated in the complaint by reference. Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991). A court may consider "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit."). Patane, 508 F.3d at 112. (quoting Rothman v. Gregor, 220 F.3d 81, 88 (2000)). Even where a document is not incorporated by reference, the court may consider it where "the complaint relies heavily upon its terms and effect," which renders the document "integral" to the complaint. Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (quoting Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995)) (per curiam) (citation omitted). On a motion to dismiss a court may consider "matters of which judicial notice may be taken, or ... documents either in plaintiffs' possession or of which plaintiff's had knowledge or relied on in bringing

suit". <u>Chambers</u>, 282 F.3d at 153 (quoting <u>Brass v. American Film Tech. Inc.</u>, 987 F.2d 142, 150 (2d Cir. 1993).

**POINT II**

**THE FIRST AMENDMENT CLAIMS**

Plaintiff claims that defendants engaged in retaliatory conduct that violated his rights to free speech and association guaranteed by the First Amendment when they preferred disciplinary charges against him which resulted in a thirty day suspension without pay. These claims fail for two reasons. First, plaintiff's speech is not constitutionally protected. Hence, even if defendants punished plaintiff based on the speech or associational rights connected to the speech, the First Amendment does not shield plaintiff from discipline because plaintiff's speech was made in connection with his duties as a public employee. Second, the disciplinary charges under which plaintiff was prosecuted and for which the penalty was assessed, were not based on any infraction associated with plaintiff's free speech or associational rights.

A.    <u>Plaintiff Fails to Make Out a Prima Facie Case of First Amendment Retaliation</u>

It is well settled that § 1983 "is not itself a source of substantive rights," but merely provides "a method of vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." <u>Baker v. McCollan</u>, 443 U.S. 137, 144, n.3 (1979). Plaintiff's attempt to base the § 1983 claim on a violation of the First Amendment fails because he cannot make out a prima facie case of First Amendment retaliation.

To state a prima facie case of First Amendment retaliation under § 1983, a plaintiff must demonstrate that (1) his speech was constitutionally protected; (2) he suffered an adverse employment action; and (3) a causal connection exists between the speech and the adverse action so that it can be said that the speech was the motivating factor in the determination. <u>Washington</u>

7

v. County of Rockland, 373 F.3d 310, 320 (2d Cir. 2004); Panse v. Eastwood, 2007 U.S. Dist.

LEXIS 55080, at *9 (S.D.N.Y. July 20, 2007) (accord). Speech is constitutionally protected if

plaintiff spoke as a citizen on a matter of public concern rather than as a public employee on a

matter of personal interest. Johnson v. Ganim, 342 F.3d 105, 112 (2d Cir. 2003). Plaintiff is

unable to satisfy the first and third prongs of the three-part test enunciated in Washington v.

County of Rockland. 373 F.3d at 320.

      B.     Plaintiff's Speech is not Constitutionally Protected

      Plaintiff identifies the radio transmission as the First Amendment speech/conduct for

which defendants allegedly retaliated against him by preferring disciplinary charges that resulted

in a thirty day suspension without pay. (Compl. ¶¶ 11-13, 17) Plaintiff does not allege any other

First Amendment violation as the basis of the § 1983 claims.

      The radio transmission is not constitutionally protected speech. Therefore, defendants

would not violate the First Amendment to discipline plaintiff because of such speech.

      The First Amendment does not shield plaintiff from discipline for conduct performed

during the course of his duties. Plaintiff made the radio transmission about the fatigued nature of

the fire fighters as part of his duties as a fire fighter and fire lieutenant. Consequently,

defendants can punish him for such speech without violating his First Amendment rights.

      In Garcetti v. Ceballos, the Supreme Court clarified that the threshold question in First

Amendment public speech cases is two-fold. First, in determining whether the speech in

question is protected, the district court must decide whether the plaintiff was speaking "as a

citizen". Garcetti, 547 U.S. 410, 418 (2006). In addressing this threshold question, we must also

recognize that "when public employees make statements pursuant to their official duties, the

employees are not speaking as citizens for First Amendment purposes, and the Constitution does

not insulate their communications from employer discipline." 547 U.S. at 421. Second, if the court determines that the plaintiff spoke as a citizen, it must then conduct the analysis set forth in Connick v. Myers, and establish whether, viewing the record as a whole and based on the content, context, and form of a given statement whether the employee's speech addresses a matter of public concern. Connick, 461 U.S. 138, 147-48 (1983). The inquiry into the protected status of speech is one of law, not fact. Id., 461 U.S. at 148 n.7. Heffernan fails the first part of the threshold question, which obviates the need to proceed to the Connick analysis.

When plaintiff cautioned defendants by radio transmission that the fire fighters who had been engaged in the live fire training drill and were called to "go available" were fatigued, plaintiff was acting pursuant to his official duties as a fire fighter in general and a fire lieutenant in particular.

Decisions rendered in the wake of Garcetti have developed the analysis necessary to distinguish when public employees' speech is made pursuant to official duties and hence, not protected by the First Amendment. In Mills v. City of Evansville, 452 F.3d 646 (7th Cir. 2006), the plaintiff was a police officer who disagreed with her chief's decision on how to implement policies to combat crime and she expressed that disagreement at a meeting held on department premises during working hours. Mills, 452 F.3d at 647. The plaintiff in Mills claimed that, as a result of her statements, she received a summary counseling, was removed from her supervisory position, and was laterally transferred. Id. In affirming the judgment in favor of the defendants, the Seventh Circuit held that plaintiff was speaking pursuant to her duties because she was on duty, in uniform and discussing the formation and execution of department policy with her superior officers. Mills, 452 F.3d at 648.

The Mills court's analysis of Garcetti has been followed by several circuit courts and at least one district court in the Second Circuit. See Haynes v. Circleville, 474 F.3d 357, 364 (6th Cir. 2007); Green v. Bd. of County Comm'rs, 472 F.3d 794, 800 (10th Cir. 2007); Sweeney v. Leone, 05 Civ. 871 (PCD), 2006 U.S. Dist. LEXIS 57358, at *29-*30 (D. Conn. July 27, 2006).

Recently, a court in this district applied Garcetti and determined that a FDNY employee's memorandum requesting exemption from his duties as acting battalion chief reflects his individualized concerns about his ability to command his unit properly. Thus, his action was not entitled to First Amendment protection because it dealt with his ability to perform his official duties. Mulcahey v. Mulrenan, 2008 U.S. Dist. LEXIS 665, at *16 (S.D.N.Y, Jan. 3, 2008). See Wesolowski v. Bockelman, 506 F. Supp.2d 118, 121-22 (S.D.N.Y. 2007) (no First Amendment protection for officer who reported inmate's complaint at the direction of superior); Panse, 2007 U.S. Dist. LEXIS 55080, at *13-*14 (motion to dismiss granted and no First Amendment protection for art teacher's speech encouraging students to participate in extracurricular art course where speech was made pursuant to teacher's official duties as a teacher in the school district).

Similarly, Judge Koeltl in this district applied Garcetti and found that plaintiff-supervisor's complaints about an employee were made pursuant to the supervisor's official duties, and as such the speech was not entitled to First Amendment protection. The court found that plaintiff's official duties as supervisor included passing information up the chain of command. Benvenisti v. City of New York, 2006 U.S. Dist. LEXIS 73373, at *27 (S.D.N.Y. Sept. 23, 2006); See also Ruotolo v. City of New York, 2006 U.S. Dist. LEXIS 49903, at *9-*10 (S.D.N.Y. July 19, 2006) (report on environmental conditions in police precinct prepared by precinct's training and safety officer was part of officer's official duties, and thus could not serve

as the basis for First Amendment retaliation claim); <u>Healy v. City of N.Y. Dep't of Sanitation</u>, 2006 U.S. Dist. LEXIS 86344, at *13-*14 (S.D.N.Y. Nov. 22, 2006) (creation of inventory report was part of official duties).

The General Statement of Duties for fire lieutenant, which was in effect in April 2005, states as an example of the work, that fire lieutenant "operates portable radio and/or other radio equipment at fire or rescue scenes, and makes reports to Dispatcher of condition and unit status". (<u>See</u> Exhibit D to Smith Aff.)    Further, the Regulations provide that each member shall "[p]romptly notify the Fire Alarm Dispatcher or Deputy Chief on duty of any inability to report for duty at the time or place required." (<u>See</u> Exhibit E to Smith Aff.)[1]

Clearly, Heffernan does not act as a citizen when he conducts his daily fire fighting activities, such as supervising and directing fire fighters and informing his superiors about the condition of the fire fighters in his command.    Similarly, he did not act outside of his professional duties when he informed Dispatch on April 20, 2005, that the fire fighters who had been participating in the training drill and who were asked to "go available" were fatigued. Accordingly, he has no First Amendment protection for the radio transmission.

Moreover, Heffernan admits that, given his positions as vice president of PFFA and Chairman of PFFA's Health and Safety Committee, he was required to make the radio transmission regarding the fatigued nature of certain fire fighters required to "go available." (Compl. ¶¶ 11, 14)    We respectfully request the Court to take judicial notice of the fact that plaintiff is able to serve in these capacities because of his status as a public employee.

---

[1] Though these materials are extraneous to the complaint, the Court may consider them because plaintiff has incorporated them by reference into the complaint. Further, as a fire lieutenant, plaintiff knows of these documents and relied on them in drafting the complaint. See <u>Kramer</u>, 937 F.2d at 773; <u>Chambers</u>, 282 F.3d at 152-53.

C.    Plaintiff Cannot Show Any Causal Connection Between
      His Speech and Any Adverse Employment Action

Plaintiff will claim that the disciplinary charges that defendants preferred against him, which resulted in a recommendation, and subsequent implementation, of a thirty day suspension without pay, constitutes an adverse employment action. Plaintiff, however, is unable to show any causal connection between his speech and the suspension.

Plaintiff admits that at the disciplinary hearing, defendants, after opening statements and before the presentation of their case, withdrew from the disciplinary charges the charge pertaining to the radio transmission. (Compl. ¶ 16) Therefore, defendants did not, at the disciplinary hearing, seek to punish plaintiff for making the radio transmission. The hearing officer heard the remaining charges, which did not include any specification regarding plaintiff's speech. The remaining charges dealt solely with the slow response attributed to Heffernan as a fire lieutenant.    (See Exhibit F to Smith Aff.)    Accordingly, the hearing officer's recommendation of a thirty day payless suspension was not based on any charges or specifications pertaining to plaintiff's speech. Straub, by adopting and imposing the hearing officer's recommended penalty, did not punish plaintiff for the radio transmission but for the charges and specifications on which the hearing officer found plaintiff guilty. Thus, plaintiff is unable to link the suspension to any First Amendment activity. Accordingly, plaintiff's First Amendment claims fail.

<u>**POINT III**</u>

<u>**PLAINTIFF'S EQUAL PROTECTION CLAIM FAILS**</u>

Plaintiff, in the third cause of action, alleges that defendants treated him disparately as contrasted with the treatment accorded Toglia in violation of plaintiff's Equal Protection rights guaranteed by the Fourteenth Amendment. Plaintiff appears to allege an equal protection violation on the basis of selective treatment. This claim fails because plaintiff is unable to establish that he was treated differently from any similarly situated employee.

To prevail on a selective treatment claim, a plaintiff must show that (1) he was treated differently from other similarly-situated individuals; and (2) the differential treatment was based on "impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." <u>Skehan v. The Village of Mamaroneck, et al.</u>, 465 F.3d 96, 110 (2d Cir. 2006) (quoting <u>Harlen Assocs. v. Inc. Vill. of Mineola</u>, 273 F.3d 494, 499 (2d Cir. 2001) (citations omitted).

Courts in this Circuit have noted that in order to be deemed similarly situated, the comparators "must be situated very similarly indeed," and "similarly situated in all material respects." <u>Payne v. Huntington Union Free Sch. Dist.</u>, 219 F. Supp.2d 273, 279 (E.D.N.Y. 2002) (quoting <u>Shumway v. United Parcel Service</u>, 118 F.3d 60, 64 (2d Cir. 1992)(citation omitted).

Plaintiff identifies one comparator, Toglia, as the employee to whom he believes he is similarly situated and who defendants treated differently. Plaintiff's allegations of similarity and different treatment are belied by the statements in his own Complaint.

Plaintiff and Toglia are fire lieutenants for the Department. (Compl. ¶¶ 3, 12) Defendants preferred identical disciplinary charges against them in connection with the slow response time demonstrated by the fire fighters' reaction to Roberto's directive to "go available"

on April 20, 2005. (Compl. ¶¶ 10, 12). The similarity between plaintiff and Toglia ends here. Toglia settled the disciplinary charges and received a one day suspension without pay. (Compl. ¶ 15) The disciplinary charges preferred against plaintiff did not settle and proceeded to the disciplinary hearing. The independent hearing officer, after hearing the evidence on both sides, recommended a thirty day suspension without pay. (Compl. ¶ 16) Straub adopted the hearing officer's recommendation and imposed the penalty. (Compl. ¶ 17)

To the extent that defendants preferred the same disciplinary charges against Heffernan and Toglia for the slow response time, defendants treated them similarly for the same offense. The difference in penalty (Toglia received a one day payless suspension and Heffernan received a thirty day payless suspension) (Compl. ¶¶ 15, 16-18), cannot be attributed to defendants. Toglia settled the disciplinary charges prior to the hearing, which makes his situation different from Heffernan's whose charges proceeded to a hearing. Heffernan does not allege in the complaint that defendants failed or refused to offer him an opportunity to settle the charges.

Contrary to plaintiff's assertions, Heffernan and Toglia are not similarly situated. Accordingly, Toglia cannot be deemed a proper comparator for purposes of Heffernan's selective treatment claim. The Second Circuit has repeatedly clarified that it rigorously enforces the requirement of similarity in selective treatment cases. For example, in Shumway, the plaintiff alleged that a new manager enforced a previously ignored anti-fraternization policy. Upholding the district court's dismissal of the plaintiff's equal protection claim, the court held that the relevant comparators were others whom the new manager had caught violating the policy, not those detected by prior managers. Shumay, 118 F.3d at 64. Similarly, in Cruz v. Coach Stores, Inc., the plaintiff, terminated for fighting, alleged selective treatment of a policy calling for termination of employees who engaged in fights or verbal assaults. Upholding the

dismissal of plaintiff's claim, the court held that similarly situated employees consisted of those caught fighting, not those who engaged in verbal assaults. Cruz, 202 F.3d 560, 568 (2d Cir. 2000). Accordingly, under Second Circuit precedent of strict enforcement of the "similarly situated" element of the selective treatment claim, Toglia is not a proper comparator for Heffernan.

Proper comparators for Heffernan could come in two categories: employees who defendants deemed responsible for the same or similar offense of a slow response time and defendants failed to prefer disciplinary charges against them; or employees who defendants preferred disciplinary charges against and the hearing officer recommended a penalty less than thirty days and Straub adopted the penalty or where the hearing officer recommended a thirty day suspension penalty and Straub reduced the penalty. Heffernan has not identified any employees in these categories.

For these reasons, an examination of Heffernan's Equal Protection allegations reveals that he has failed to identify similarly situated employees engaged in similar conduct who were treated differently. Accordingly, Heffernan's equal protection claim fails and must be dismissed. See Chesney v. Valley Stream Union Free School Dist., No. 07 Civ. 5106 (DRH (ETB), 2006 U.S. Dist. LEXIS 68137, at *19-*20 (E.D.N.Y. Sept. 22, 2006) (dismissing complaint where allegations failed to adequately allege plaintiff was treated differently than any similarly situated individuals); Sanchez v. City of Hartford, 10 F. Supp.2d 162, 170 (D. Conn. 1998) (dismissing equal protection claim for failure to provide factual allegations detailing "how he was treated, how other similarly situated white employees were treated, and how these treatments differed").

It appears that plaintiff's equal protection claim, is in actuality, an attempt to challenge the findings and conclusion of the hearing officer. This Court is not the forum for such a

challenge. See Connick, 461 U.S. at 147 (federal court not appropriate forum to review the wisdom of a public agency's personnel decision taken when an employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest).

## POINT IV

## QUALIFIED IMMUNITY

Plaintiff has sued defendants Straub, Lyman, Houlihan, and Roberto in their individual capacities. In the event the Court does not dismiss the lawsuit in its entirety, the individually named defendants are entitled to qualified immunity and should be dismissed from the lawsuit.

The Supreme Court has long held that government officials performing discretionary functions generally are shielded from civil liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). It is clear that defendants' conduct in preferring disciplinary charges, prosecuting these charges, and imposing a hearing officer's penalty, does not violate any clearly established statutory or constitutional right of which a reasonable person would have known. Indeed, plaintiff has not alleged so in the complaint.

Moreover, the Supreme Court has instructed that the immunity question is a threshold issue and discovery should not be allowed until this question is resolved. Harlow, 457 U.S. at 818-19.

## CONCLUSION

Based on the foregoing, defendants respectfully request the Court to dismiss this action in its entirety pursuant to Fed. R. Civ. P. 12(b)(6) and grant defendants such other relief as the Court deems appropriate.

Dated: New York, New York
      March 19, 2008

                    Respectfully submitted,

                    LEWIS BRISBOIS BISGAARD & SMITH, LLP


By:_____i/s_____
                Ivan D. Smith (IS-2659)
                Attorneys for Defendants
                199 Water Street, Suite 2500
                New York, New York 10038-3516
                (212) 232-1300

TO:

Jonathan Lovett, Esq. (JL-4854)
LOVETT & GOULD, LLP
Attorneys for Plaintiff
222 Bloomingdale Road
White Plains, New York  10605
(914) 428-8401

EXHIBIT "A"

12-14-07

# UNITED STATES DISTRICT COURT

_____ SOUTHERN _____ District of _____ NEW YORK _____

KEVIN HEFFERNAN,

Plaintiff,

-against-

FRANK G. STRAUB, individually, and in his capacity as
Commission of Public Safety for the City of White Plains, N.Y.,
RICHARD LYMAN, individually and in his capacity as Chief of
the City of White Plains Fire Bureau, Department of Public
Safety, RICHARD HOULIHAN, individually, and in his capacity
as Deputy Chief, White Plains Fire Bureau, Department of Public
Safety, VINCENT ROBERTO, individually and in his capacity as
Deputy Fire Chief, White Plains Fire Bureau, Department of
Public Safety and the CITY OF WHITE PLAINS, New York,

Defendants.

## SUMMONS IN A CIVIL ACTION

Case No.

**07 CIV 11260**

**JUDGE CONNER**

RECEIVED

TO: (Name and Address of Defendant)

FRANK G. STRAUB, Commissioner of Public Safety, 77 Lexington Avenue, White Plains, New York

RICHARD LYMAN, Chief of the City of White Plains Fire Bureau, Dept. of Public Safety, 77 Lexington
Avenue, White Plains, New York

RICHARD HOULIHAN, Deputy Chief, White Plains Fire Bureau, Dept. of Public Safety, 77 Lexington
Avenue, White Plains, New York

VINCENT ROBERTO, Deputy Fire Chief, White Plains Fire Bureau, Dept. of Public Safety, 77 Lexington
Avenue, White Plains, New York

CITY OF WHITE PLAINS, New York, City Hall, 255 Main Street, White Plains, New York

_Accepted on behalf of the
City of White Plains and the
named individually in their
official capacities not
individually._

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY,
Lovett & Gould, LLP
222 Bloomingdale Road
White Plains, New York 10605
(914) 428-8401

an Answer to the Complaint which is herewith served upon you, within twenty days after service of this Summons upon
you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief
demanded in the Complaint. You must also file your answer with the Clerk of this Court within a reasonable period of
time after service.

**J. MICHAEL McMAHON**                                    DEC 14 2007

CLERK                                                          DATE

_____
BY DEPUTY CLERK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
KEVIN HEFFERNAN,

                                        Plaintiff,

                    -against-

FRANK G. STRAUB, individually and in
his capacity as Commissioner of Public
Safety for the City of White Plains, N.Y.,
RICHARD LYMAN, individually and in his
capacity as Chief of the City of White Plains
Fire Bureau, Department of Public Safety,
RICHARD HOULIHAN, individually and
in his capacity as Deputy Chief, White Plains
Fire Bureau, Department of Public Safety,
VINCENT ROBERTO, individually and in
his capacity as Deputy Fire Chief, White
Plains Fire Bureau, Department of Public
Safety and the CITY OF WHITE PLAINS,
New York,

                                        Defendants.
------------------------------------------------------x



07 Civ.    (        )

# 07 CIV 11260

## JUDGE CONNER

COMPLAINT    FILED

DEC 1 4 2007

USDC WP SDNY

**Jury Trial Demanded**

        Plaintiff KEVIN HEFFERNAN, by his attorneys Lovett & Gould, LLP, for his

complaint respectfully states:


## NATURE OF THE ACTION

        1. This is an action for compensatory and punitive damages, proximately resulting

from retaliatory conduct jointly engaged in by Defendants while they were acting under

color of the laws of the State of New York, for violations of Plaintiff's rights as

guaranteed by the First and Fourteenth Amendments to the United States Constitution, 42

U.S.C. §1983.

## JURISDICTION

2. The Court's jurisdiction is invoked pursuant to 28 U.S.C. §§1331, 1343.

## THE PARTIES

3. Plaintiff KEVIN HEFFERNAN is a citizen of the United States, a domiciliary of the State of New York, and a resident of the Northern Counties. At all times relevant to this complaint he was: i) a Fire Lieutenant employed in the White Plains Fire Bureau, Department of Public Safety of the City of White Plains, New York; ii) the Vice President of the Professional Fire Fighters Association, Inc. (hereinafter "PFFA"), Local 274, I.A.F.F., A.F.L.-CIO; and iii) the duly appointed Chairman of the PFFA's Health and Safety Committee (hereinafter alternatively "Chairman").

4. Defendant FRANK G. STRAUB (hereinafter "Straub"), who is sued individually and in his official capacity, at all times relevant to this complaint was employed as Commissioner of Public Safety for the City of White Plains, New York. As such he is a policymaker for the Defendant City and in that connection has final, discretionary decision making authority over the institution, prosecution and final administrative disposition of disciplinary proceedings brought against members of the Fire Bureau pursuant to Section 75 of the New York State Civil Service Law.

5. Defendant RICHARD LYMAN (hereinafter "Lyman"), who is sued individually and officially, at all times relevant to this complaint was employed as Fire Chief of the City of White Plains Fire Bureau, Department of Public Safety,

2

6. Defendant RICHARD HOULIHAN (hereinafter "Houlihan") who is sued individually and in his official capacity, at all times relevant to this complaint was employed as Deputy Chief, White Plains Fire Bureau, Department of Public Safety.

7. Defendant VINCENT ROBERTO (hereinafter "Roberto"), who is sued individually and in his official capacity, at all times relevant to this complaint was employed as Deputy Fire Chief, White Plains Fire Bureau, Department of Public Safety.

8. Defendant CITY OF WHITE PLAINS, New York (hereinafter "City") is a municipal corporate subdivision of the State of New York duly existing by reason of and pursuant to the laws of said State.

## THE FACTS

9. On April 20, 2005, at the direction of Roberto "live fire" training was conducted requiring the presence at the Department's drill school of four out of the nine City fire trucks - - a circumstance which, by reason of Roberto's stunning stupidity, left available for the entire City's fire protection only one rescue vehicle, three fire engines and one truck. At no time was Roberto subjected to disciplinary action by Straub, despite his (Roberto's) having unilaterally, literally put the health and safety of the entire City of White Plains at risk.

10. Following the conduct of certain live fire training exercises, a real fire broke out at the rear of a residence situated at 10 Rose Street in the City as a result of which Roberto directed that the live fire training cease and that the equipment and men training at the drill site "go available", that is return to their respective firehouses to "cover" the City.

3

11. Justifiably concerned about the health and safety of the fire fighters who had been engaged in the live fire training and as a result were obviously physically exhausted, Plaintiff by radio transmission cautioned Defendants - - as he was required to do solely by reason of his status as Vice President of the PFFA and Chairman of the PFFA's Health and Safety Committee - - that those fire fighters were "fatigued".

12. As a proximate result of Plaintiff's expression of concern and motivated by a intent to retaliate against Plaintiff by reason of that expression of concern, Straub, Lyman, Houlihan and Roberto entered into an agreement on April 20, 2005, to institute and prosecuted disciplinary proceedings intended to terminate Plaintiff's employment. In that connection and with a view towards giving the false impression that the disciplinary action was being pursued because of a supposedly slow response time demonstrated by the fire fighters' reaction to Roberto's directive referenced in paragraph "10", *supra*, two Fire Lieutenants were brought up on disciplinary charges: Plaintiff and Lawrence Toglia (hereinafter "Toglia"). Toglia was not an official of the PFFA and had no PFFA responsibilities for matters relating to health and safety of PFFA members.

13. In furtherance of Defendants' plan to retaliate against Plaintiff, and to use Toglia to create the referenced false impression:

a. Lyman preferred against Toglia disciplinary charges accusing him, in substance, of failing to timely respond to Roberto's order to "go available", and,

b. Lyman on or about July 29, 2005, preferred against Plaintiff the exact same disciplinary charges as preferred against Toglia but additionally accused Plaintiff of violating Section 128 of the Department of Public Safety's rules (prohibiting members from engaging in conduct "which may bring reproach or reflect discredit upon the

4

Department"). Specifically with respect to Plaintiff, and unlike Toglia, a sixth disciplinary charge as agreed to by all of the Defendants alleged:

> ". . .that on or about April 20, 2005[,] at approximately 1:47 p.m., you made an inappropriate radio transmission advising Ross Street command that drill school companies are fatigued during a working fire".

14. Because that sixth Charge targeted Plaintiff for speaking out on a matter of public concern in his Vice President and Chairman capacities, on November 15, 2005, the PFFA filed an Improper Practice Charge (#U26382, hereinafter "IP") with the New York State Public Employment Relations Board (hereinafter "PERB"). By "Notice" dated November 30, 2005, and received by the City's Department of Law on December 2, 2005, PERB directed that the City and PFFA attend a conference on January 12, 2006, with respect to the IP.

15. Under the circumstances and by prior agreement among the Defendants, Toglia's disciplinary charges were amicably resolved as a result of which Toglia forfeited one day's pay.

16. Since Plaintiff's disciplinary charges were not disposed of by agreement, a formal disciplinary hearing commenced on December 13, 2005. In that connection Defendants, by the City's Law Department, advised the Hearing Officer in an opening statement that Plaintiff's supposed misconduct was so "egregious" as to warrant his "dismissal" from the City's employ. Immediately following those opening remarks,

5

Defendants' legal representative withdrew, on behalf of "Commissioner Straub", Charge VI - - manifestly because Defendants appreciated that Plaintiff's expression of concern regarding matters of health and safety, as articulated by him in his Vice President/Chairman of the Health and Safety Committee capacities, comprised First Amendment protected speech expressed by Plaintiff in the exercise of his associational rights..

16. On March 18, 2007, the Hearing Officer, Robert Ponzini, Esq. - - who had been intentionally selected because of his well-established (and justified) reputation for always ruling against employees in Section 75 disciplinary proceedings and always ruling in favor of the municipal corporation because it pays his fees - - issued a report and recommendation substantially ignoring the evidence, finding Plaintiff "guilty" and recommending (based, upon information and belief, upon an *ex parte* communication with the Defendants' legal representative) imposition of a thirty day payless suspension.

17. On April 24, 2007, Straub adopted Ponzini's recommendations and issued a final administration determination imposing upon Plaintiff a thirty day payless suspension "commencing April 26, 2007[,] through and including May 25, 2007".

18. As a proximate result of Defendants' retaliatory plan and the acts taken by them in furtherance of it, Plaintiff has been forced to endure: substantial pecuniary losses; a break in service attributable to the payless suspension and a concomitant impairment of his future retirement benefits; punishment for exercising his right of free speech as protected by the First Amendment; punishment for exercising his right of association as protected by the First Amendment; denial, when contrasted with identically situated Fire Lieutenant Toglia, of his right to Equal Protection; emotional upset; anxiety; fear of

6

termination of employment as demanded by Defendant's counsel at the outset of the disciplinary hearing; public embarrassment; public humiliation; a chilling of his prospective exercise of his rights as guaranteed by the First Amendment; shame; and he has otherwise been rendered sick and sore.

## AS AND FOR A FIRST CLAIM

19. Repeats and realleges as if fully set forth the allegations of fact contained in paragraphs "1" to "18", inclusive.

20. Under the premises Defendants' retaliatory conduct violated Plaintiff's right to free speech as guaranteed by the First Amendment to the United States Constitution, 42 U.S.C. §1983.

## AS AND FOR A SECOND CLAIM

21. Repeats and realleges as if fully set forth the allegations of fact contained in paragraphs "1" to "18", inclusive.

22. Under the premises Defendants' retaliatory conduct violated Plaintiff's right of association as guaranteed by the First Amendment to the United States Constitution, 42 U.S.C. §1983.

## AS AND FOR A THIRD CLAIM

23. Repeats and realleges as if fully set forth the allegations of fact contained in paragraphs "1" to "18", inclusive.

24. Under the premises Defendants' disparate treatment of Plaintiff, as contrasted with the treatment accorded identically situated Fire Lieutenant Toglia, violated Plaintiff's right to Equal Protection as guaranteed by the Fourteenth Amendment to the United States Constitution, 42 U.S.C. §1983.

WHEREFORE judgment is respectfully demanded:

a.  Awarding against the individually named Defendants such punitive damages as the jury may impose,

b.  Awarding against all Defendants such compensatory damages as the jury may determine,

c.  Awarding against all Defendants reasonable attorney's fees and costs, and,

d.  Granting such other and further relief as to the Court seems just and proper.

Dated: November 30, 2007
       White Plains, N.Y.

LOVETT & GOULD, LLP
By:
Jonathan Lovett (4854)
Attorneys for Plaintiff
222 Bloomingdale Road
White Plains, N.Y. 10605
914-428-8401

8

EXHIBIT "B"

FINAL - 11/16/05

TAPE TYPED 06/16/05

SUBJECT: 10 Rose Street, 10-5



PLAINTIFF'S
EXHIBIT
Joint 1
12-13-05d7

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DATE: APRIL 20, 2005, TIME OF CALL 1308:41 SECONDS

POLICE CHANNEL #5

Headquarters to Engine 66, Engine 71, Engine 70, Ladder 32 and Rescue 88.
Location of this alarm is 10 Rose Street on a report of a heavy smoke
condition from the rear of the house. Engine 66, Engine 71, Engine 70,
Ladder 32 and Rescue 88 10 Rose Street cross is Hubbard Drive and
Carrigan Avenue. Received?

(all taking simultaneously) 10 Rose Street.                        13:09

VOCAL 71 10 Rose 10-4
ALARM                                                              13:09.

DISP. Ladder 32, Rescue 88 received?
                                                                   13:09

2512   2512 to companies at drill school.Make yourselves
       available.
                                                                   13:11

2512   2512
                                                                   
FPDC   Drill School Incident Command to car 2512
                                                                   13:11

2512   2512
                                                                   13:12

FPDC   They are ah live burns. They are pulling out now. There
       will be a delay on any response.
                                                                   13:12

2512   10-4
                                                                   13:12

DISP   Headquarters responding apparatus location of this alarm is
       10 Rose Street on a report of a heavy smoke condition.
  P.D. Please be advised there is a heavy smoke condition at that
       location.
                                                                   13:12

2512   2512 10 Rose Street.

E71    Engine 71 on the scene (unable to understand) smoke coming
       from the rear of the building
                                                                   13:14

DISP   10-4 message received.
                                                                   13:14

DC     Engine 71 stretch a line to the front door.
                                                                   13:15

L32     Ladder 32 on the scene.  Smoke condition rear of the house. 13:16

DISP    10-4 Ladder 32.
                                                                        13:16

D.C     Rescue 88 report to the command in front of the building.      13:16

D.C.    Ladder 32 provide ventilation in the rear of the building.     13:16

D.C.    2512 to Headquarters.
                                                                        13:17

DISP.   2512
                                                                        13:17

D.C.    Headquarters contact the units at drill school. Get them
        available as soon as possible.
                                                                        13:17

DISP.   10-4 2512
                                                                        13:17

SP6     Engine 70 we're charging the hydrant.
                                                                        13:17

VOCAL   Headquarters to Engines 67, 65, Ladder 34, Tower Ladder 6
        Do you receive.  Make yourselves available for a structure
        fire at 10 Rose Street.  That's Engines 65, 67, Ladder 34,
        Tower Ladder 6.  Advise that you receive.
                                                                        13:18

FPDC    Drill School Incident Command to Headquarters.
                                                                        13:18

DISP.   Fire apparatus calling go ahead.
                                                                        13:18

FPDC    Drill School Incident Command is readying Engine 67, Ladder
        34, they are on a delay.
                                                                        13:18

E66     Engine 66 on the scene 10 Rose Street.
                                                                        13:19

DISP    Headquarters 2512
                                                                        13:19

D.C     2512 come in.
                                                                        13:19

DISP    Who would you like for ah Con Ed, gas, electric or both?       13:19

D.C.    Neither at this time.
                                                                        13:19

DISP    Alright, 10-4.  67 and ah 30 Ladder 34 advise that they're
        going to be ah enroute.
                                                                        13:19

D.C.    Headquarters.  Have them relocate ~~and~~ to standby at Station 6. 13:19

DISP    10-4.
                                                                        13:19

D.C.    Headquarters also advise the Fire Chief we have a working
        fire at this location.
                                                                        13:19

DISP    10-4 2512.  Public Safety 3 is also enroute.                    13:19

PS3     Block off area. Public 56 Headquarters. Public Safety 5 has
        Been notified.                                                  13:20

DISP    10-4 message received.                                          13:20

D.C.    Engine 66 set up for a backup line.                             13:20

E66A    66 10-4                                                         13:20

DISP    Headquarters to Engine 67, Ladder 34.                           13:21

PS3     2512 give me a progress report.                                 13:21

L34A    Ladder 34 is relocating to Headquarters Station 6.              13:22

DISP    10-4 Headquarters to.....                                       13:22

PS3     Public Safety 3 to 2512 give me a progress.                     13:22

D.C.    Public Safety 3 stand by.                                       13:22

E67     Engine 67 to Headquarters.                                      13:22

L32A    Ladder 32 one to Command                                        13:22

D.C.    2512 Public Safety 3.  Possibly have a fire in the basement
        which is extending to the first floor.  One line is moving
        in on the basement an extension line is coming in to cover
        extension on the first floor                                    13:22

PS3     10-4.                                                           13:23

L32A    Ladder 32 to Command.                                           13:23

D.C.    2512.                                                           13:23

D.C.    Rose Street Command is on for Ladder 32.                        13:23

L32A    Second floor. No one on the second floor. We have ventilated
        the second floor with (unable to understand) fire in the
        basement.                                                       13:23

R88A    RESCUE 88 to Car 2512.                                          13:23

D.C.    Rose Street (unable to understand) come in.                     13:23

R88A    (unable to understand)                                          13:23

PS3      Public Safety 3 is "ON THE SCENE"
                                                          13:24

E67      Engine 67 to Headquarters.
                                                          13:24

DISP     Engine 67
                                                          13:24

E66A     Engine 66 Charge the back-up line
                                                          13:24

DISP     Headquarters Engine 67 go ahead.
                                                          13:24

E67      Engine 67 is available and on it's way to Station 6. ✗ RUSSELL
                        BACKUP LINE                       13:24

E66A     66 Command have the Vests come up.
                                                          13:24

D.C.     No.
                                                          13:24

D.C.     Command is on for Engine 66 repeat your message.
                                                          13:25

DISP.    Headquarters 2512.
                                                          13:25

D.C.     2512 is on for Headquarters.
                                                          13:25

DISP.    2512 I have another ah I have a smoke detector alarm from
         the basement at 18 Colonial Road.  I'm gonna have to ah use
         Engine 67, Ladder 34.  Is that OK?
                                                          13:26

D.C.     10-4 Utilize those available rigs.
                                                          13:26

DISP     10-4 message received.
                                                          13:26

D.C.     2512 to Headquarters um relocate MUTUAL AID vehicle into the city to
         cover.
                                                          13:26

DISP     10-4 2512.
                                                          13:26

DISP     Ah 2512 just clarify continue Engine 67, Ladder 34 to 18
         Colonial Road and have mutual aid cover Station 6.
                                                          13:27

D.C.     MUTUAL AID    TO
         A (unable to understand) Station 2 and Station 6.
                                                          13:27

L34      Ladder 34 to headquarters.  Are you dispatching us?
                                                          13:27

DISP     Yes, 67, Ladder 34 18 Colonial Road.  Smoke detector alarm
         from the basement.  Cross is Bryant Avenue and Platt Place.
         18 Colonial Road
                                                          13:27

E67      67 (unable to understand) RESPONDING  18 Colonial
                                                          13:28

L32A     Ladder 32 to Rose Street command.
                                                          13:28

| | | |
|---|---|---|
| L32A | We have located a fire on the first floor (unable to understand). On the corner of (unable to understand). C & D EXPOSURE | 13:28 |
| DISP | Headquarters to Ladder 34. | 13:29 |
| L34 | Ladder 34 | 13:29 |
| DISP | Stay in service.  You can discontinue your response to 18 Colonial Road.  Engine 67 only to respond to 18 Colonial Road set off by a plumber at that location accidentally. | 13:29 |
| L34 | Ladder 34 is discontinuing response and going to Station 6. | 13:29 |
| DISP | 10-4 | 13.29 |
| D.C | 2512 to Headquarters. | 13:29 |
| DISP | 2512 | 13:29 |
| D.C. | As soon as Engine 65 is available have them respond to the ah scene at Rose Street. | 13:29 |
| DISP | 2512 10-4. | 13:29 |
| E67 | Engine 67 on the scene 18 Colonial investigating. | 13:30 |
| DISP | 10-4 67 | 13:30 |
| D.C. | 2512 to Ladder 32 report out to the Command Post. | 13:31 |
| L32A | Ladder 32 10-4.  Ladder 32 B and C report to the Command Post. | 13:31 |
| DISP | Apparatus calling you're broken up.  Repeat. | 13:32 |
| E65C | Engine 67 at 18 Colonial. | 13:32 |
| L32A | Ladder 32A to Ladder 32B. | 13:32 |
| L32A | Ladder 32A to Ladder 32B | 13:32 |
| L34 | Ladder 34 is responding to Rose per 2512 Headquarters. | 13:32 |
| DISP | Ladder 34 10-4. | 13:33 |
| DISP | Headquarters Engine 65. | 13:34 |
| TL6A | 65. | 13:34 |

| | | |
|---|---|---|
| DISP | As soon as you're available respond out to the ah scene. | 13:34 |
| TL6A | 10-4. | 13:34 |
| E67 | 67 to Headquarters. | 13:35 |
| DISP | Engine 67 | 13:36 |
| E67 | Engine 67 is clear 18 Colonial and it's back to Station 6. | 13:36 |
| DISP | 10-4 67. | 13:36 |
| L34 | Ladder 34 is on the scene Rose Street. | 13:37 |
| R88A | Rescue 88 to Car 2512 the main has been shut down (unable to understand) | 13:37 |
| D.C. | 10-4 Rescue 88.  Ladder 34 do not come in.  Stop. | 13:37 |
| L34 | Ladder 34.  We're staying here. | 13:37 |
| D.C. | 2512 to Headquarters | 13:37 |
| DISP | 2512 | 13:37 |
| D.C. | Ah who did you detail to Colonial? | 13:37 |
| DISP | Engine 67.  He just picked up and is returning back to ah Station 6. | 13:37 |
| D.C. | 10-4 Have you detailed Ladder 34 to Colonial as well? | 13:37 |
| DISP | I had but I ah put him back into ah station house.  It was a plumber accidental at that location so I detailed Engine 67 per 2516. | 13:37 |
| D.C. | 10-4 Have Engine 67 and Ladder 34 relocate to Station 6 for standby. | 13:38 |
| DISP | 10-4 2152. | 13:38 |
| L34 | Ladder 34 to 2512 we receive. | 13:38 |
| DISP | Headquarters to 2512. | 13:39 |
| D.C. | 2512 come in. | 13:39 |
| DISP | 2512 I need to know what group number to recall 3 Fire Fighters and 1 Lieutenant I'm told. | 13:39 |
| D.C. | Use the telestaff outbound. | 13:39 |
| DISP | It's not letting us in. | 13:39 |

| | | |
|---|---|---|
| D.C. | Stand by Headquarters. | 13:39 |
| DISP | Headquarters Engine 65.  You enroute to the scene? | 13:41 |
| TL6A | Engine 65 to Headquarters.  Engine 65 we're still at White Plains drill school.  I'm available. | 13:41 |
| D.C. | 2512 to Tower Ladder 6 Lieutenant. | 13:41 |
| TL6A | Ladder 6.  Go ahead 12. | 13:41 |
| D.C. | Ah drop the hose lines at ah drill school, lock the gate behind ya and ah report with Engine 65 to Station 2. | 13:41 |
| TL6A | 10-4. | 13:41 |
| DISP | Headquarters Engine 65. | 13:43 |
| E67A | Engine 65. | 13:43 |
| DISP | Engine 65 are you back in service? | 13:43 |
| E67A | Negative.  We are still putting our hose back on and now we are getting to pick up and we'll be back in service in a couple of minutes. | 13:43 |
| DISP | 10-4. Tower Ladder 6 same message.  You back in service? | 13:43 |
| TL6A | We're picking up now ah we're leaving drill school.  We'll be back in service shortly. | 13:43 |
| DISP | 10-4. | 13:43 |
| TL6A | Ladder 6 to Headquarters. | 13:44 |
| DISP | Tower Ladder 6. | 13:44 |
| TL6A | Advise Rose Street Command that the four companies that were located at the White Plains drill school are fatigued. | 13:44 |
| DISP | Ah Tower Ladder 6 that part was broken up.  You have Fire Fighters that are fatigued?  You need ah relocation? | 13:44 |
| TL6A | Negative.  65 and Tower Ladder 6 will be responding back to Station 2 but the companies that were at White Plains drill school are fatigued. | 13:44 |
| DISP | OK.  10-4. | 13:44 |
| D.C | 2512 to Headquarters.  I read Tower Ladder 6's message ~~correctly~~. DIRECTLY | 13:45 |

DISP    Headquarters to 2512.                                            13:45

D.C.    2512 come in.                                                    13:45

DISP    2512. I'm showing Engine 66, Engine 70, Engine 71, and
        Rescue 88 on the scene out there.  Do you require any
        further or do you have other units there?                       13:45

DC      Ah no other units are required.                                 13:45

DISP    10-4 2512.  Do you have a ladder on the scene?                  13:45

E65     Engine 65 to Headquarters we're available.                      13:46

DISP    10-4 Engine 65                                                   13:46

TL6     Ladder 6 to Headquarters, Ladder 6 is available, returning
        from Drill School to Station 2.                                 13:48

DISP    10-4 Tower Ladder 6.

**EXHIBIT "C"**

## INTER-OFFICE MEMORANDUM

DATE: 4/20/05

TO: Chief Lyman

FROM: LT. K. Heffernan

SUBJECT: Drill school /10 Rose st.

Dear Chief,

Per your request here is an accounting of the events surrounding drill school /10 Rose st fire. TL-6 & Crew was assigned to white plains drill school for live fire training Evolutions.

The Companies were concluding the second of two Evolutions when we were notified of a working fire on Rose st. Shortly thereafter the Companies were requested to make themselves available and return to designated fire houses. The Companies promptly replied with the request without the benefit of rest or rehydration.

Respectfully,

Lt. K. Heffernan

L-20 /6645

EXHIBIT "D"

CITY OF WHITE PLAINS

FIRE LIEUTENANT

GRADE: F1                                              UNION CODE: PFFA

EEO JOB CATEGORY: 02                         TITLE NO.: 1200

JUR. CLASS: COMP

<u>GENERAL STATEMENT OF DUTIES</u>:  Has responsible charge of the activities of a fire company; protects life and property by performing fire fighting duties, fire prevention, hazardous materials response, and emergency medical response; does related work as required.

<u>DISTINGUISHING FEATURES OF THE CLASS</u>: Under general supervision, incumbents of this class participate in (as a Firefighter) and/or have responsible charge for directing the work of a company of Firefighters in protecting life and property by performing fire fighting duties, fire prevention/education, hazardous materials response, emergency medical response, salvage and rescue operations, use of equipment and other related work.  The incumbent has complete charge of operations both at the scene of response to a call as well as in a fire station in the absence of or pending the arrival of a higher ranking officer.  A high degree of responsibility and independent judgement is involved, and for insuring conformance with department policies, rules and regulations. This work is of a hazardous nature, involving current professional fire fighting/emergency response techniques and internal procedures, as well as mental acuity, manual dexterity, and physical stamina.  In addition, routine maintenance work and custodial work on the station house and equipment is performed.  Work is scheduled on rotating shifts, 7 days per week; 52 weeks per year.   Supervision is exercised over a company and/or companies of Firefighters.

<u>EXAMPLES OF WORK</u>:  (Illustrative only)
Leads and participates in protecting life and property by responding to fire alarms and emergency calls and by performing fire fighting duties, fire prevention, hazardous materials response, and emergency medical response;
Leads the response to all alarms/calls to assigned fire company while on duty; deploys staff and equipment;
Operates portable radio and/or other radio equipment at fire or rescue scenes, and makes reports to Dispatcher of condition and unit status;
Assigns Fire Fighters to lay out and connect hose lines and nozzles, turn water off and on, raise ladders and ventilate buildings;
Directs and participates in the work of Fire Fighters and the use of equipment at the scenes of fire/emergency response, in fire prevention, and in the fire station;
Supervises and participates in salvage operations during and immediately after a fire;
Inspects property at scene of fire to prevent re-ignition;
Inspects buildings and premises for prevention of fire/safety hazards; issues notices for violation of fire/safety codes; and prepares pre-fire plans;
Responds to and reports complaints of dangerous/hazardous conditions and code violations;
Inspects equipment, grounds and station to insure proper order and condition; orders needed repairs/replacements;
Inspects fire hydrants, reports needed maintenance or replacement, and ensures accessibility by removal of snow, ice, debris;
Supervises and participates in a wide variety of cleaning and maintenance tasks at the station;

**FIRE LIEUTENANT**  (Continued)

EXAMPLES OF WORK: (Continued)

Supervises and participates in the cleaning, checking and replacement of tools and equipment after a fire/emergency response;

Compiles and records data for reports;

Makes periodic and incidental reports of personnel and activities;

Trains and drills subordinates;

Learns and practices new methods of fire prevention, fire fighting, emergency first aid, hazardous material handling, internal procedures and other related subjects;

Makes presentations on fire safety and burn prevention at schools, service clubs or other public meetings;

Performs related tasks as required to insure the efficient and effective operation of the fire station.

REQUIRED KNOWLEDGE, SKILLS, ABILITIES AND ATTRIBUTES: Good knowledge of modern fire fighting and prevention methods and procedures, including equipment and salvage operations; good knowledge of first aid, rescue and first responder methods and procedures; good knowledge of the City's building code and fire prevention laws and ordinances; good knowledge of the principles and practices of staff development and training; ability to identify potential fire/safety hazards; good knowledge of the location and building structures of the City; ability to plan and supervise the work of firefighters and to maintain discipline; ability to communicate effectively, both orally and in writing; initiative; resourcefulness; sound judgment; physical condition commensurate with the requirements of the position.

MINIMUM ACCEPTABLE TRAINING AND EXPERIENCE: Two (2) years and three (3) months* of permanent competitive class status as a Fire Fighter in the White Plains Fire Department immediately prior to the examination date.

*NOTE: As per the court ordered Consent Decree.

SPECIAL REQUIREMENT:   Possession of a valid license to operate a motor vehicle in the State of New York.

EW
11/04

**EXHIBIT "E"**

# RULES AND REGULATIONS

### for the

## Government of Officers and Members

### of the

## BUREAU OF FIRE

## DEPARTMENT OF PUBLIC SAFETY

## CITY OF WHITE PLAINS, N. Y.

*Promulgated by Commissioner of Public Safety*

### July 1, 1977

*Approved by Common Council*

### July 1, 1977



PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT
Joint 3
12-13-05 KJ

3

This book is the property of the Fire Department of the City of White Plains, New York. Its value is fixed at Twelve Dollars. When a member severs his connection with the department this book must be returned to his Superior Officer, or the sum of Twelve Dollars will be deducted from his final pay check.

BOOK NUMBER ................................................................

NAME OF MEMBER ................................................................

BADGE NUMBER ................................................................

4

No part of this manual may be reproduced in any manner without written permission from the Commissioner of Public Safety of the City of White Plains, New York.

5

## OATH OF OFFICE

Every member of the Fire Department of the City of White Plains shall subscribe to, and take the following oath:

STATE OF NEW YORK,
COUNTY OF WESTCHESTER, } ss:
CITY OF WHITE PLAINS,

I, .................................................................. do solemnly swear that I will support the Constitution of the United States, and the Constitution of the State of New York, and that I will faithfully discharge the duties of the office ................. ................................. of the CITY OF WHITE PLAINS, according to the best of my ability.

7

## AUTHORIZATION FOR PROMULGATION AND ADOPTION OF RULES AND REGULATIONS

Pursuant to section 220 of the charter of The City of White Plains, the commissioner of public safety is given the power to make rules and regulations in regard to the government, administration, disposition and discipline of the fire department, subject to approval of the common council of The City of White Plains.

9

## PROMULGATION

By virtue of the authority and power conferred upon the commissioner of public safety by the charter of The City of White Plains, and in the exercise thereof, the following Rules and Regulations for governing the members of the uniformed force of the Fire Department of The City of White Plains are hereby promulgated.

All members of the uniformed force shall be held responsible for the strict compliance with and enforcement of these rules and regulations.

Any violation of any of the provisions of these rules and regulations shall be made the subject of charges.

All previous rules and regulations are revoked, but said revocation shall not affect or impair any act, done, offense committed or right accruing, accrued or acquired, or liability, penalty, forfeiture or punishment incurred prior to the time of such revocation but the same may be enjoyed, asserted, enforced, prosecuted or inflicted as fully and to the same extent as if such revocation had not been effected.

Amendments to these sections as now printed, may be promulgated from time to time by Official Department Orders, and shall be of full force and effect as indicated on such orders.

Dated: White Plains, N. Y.
        July 1, 1977.

BY ORDER OF

JOHN M. DOLCE,
Commissioner.

WILLIAM J. McMAHON,
Chief of Department.

11

# INDEX

| CHAPTER | | PAGE |
|---|---|---|
| | Oath of Office | 5 |
| | Authorization for Promulgation and Adoption of Rules and Regulations | 7 |
| | Promulgation | 9 |
| 1 | Definitions | 13 |
| 2 | Organization | 17 |
| 4 | Chief of Department | 19 |
| 5 | Deputy Chiefs of Department | 23 |
| 6 | Honorary Deputy Chief | 27 |
| 7 | Medical Procedure | 29 |
| 8 | Chaplains | 33 |
| 9 | Company Commanders—Lieutenants | 35 |
| 10 | Officer in Charge of Training | 41 |
| 11 | Fire Prevention Bureau | 43 |
| 12 | Motor and Pump Operators | 45 |
| 13 | General Rules | 51 |
| 14 | Fire Duty | 61 |
| 15 | Apparatus | 67 |
| 16 | Danger Signals | 71 |
| 17 | Hose | 73 |
| 18 | Nozzles and Hose Fittings | 75 |
| 19 | Hydrants | 77 |
| 20 | Housewatch Duty | 79 |

12

| CHAPTER | | PAGE |
|---|---|---|
| 21 | Telephones | 85 |
| 22 | Leave of Absence | 87 |
| 24 | Recall | 93 |
| 25 | Building Inspections | 95 |
| 26 | Public Assembly and Theatre Detail Duty | 99 |
| 27 | Reports | 101 |
| 28 | Records | 105 |
| 29 | Requisitions and Inventories | 109 |
| 30 | Flag of The United States | 111 |
| 31 | The Salute | 113 |
| 32 | National Anthem | 117 |
| 33 | Formations | 119 |
| 34 | Regulations for Uniforms | 121 |
| 35 | Suspension from Duty | 129 |
| 36 | Drills and Training | 131 |
| 37 | Fire Alarm Electrician | 133 |
| 38 | Assistant Fire Alarm Electrician | 137 |
| 39 | Firefighter—Special Services | 139 |
| 40 | Fire Alarm Dispatchers | 141 |
| 42 | Pre-Signals and Special Signals | 149 |
| 43 | Disciplinary Proceedings | 151 |
| 44 | Funerals | 155 |
| 45 | Civilian Automotive Mechanic Foreman | 159 |

13

# CHAPTER 1

## DEFINITIONS

ACTING OFFICER: The term "Acting" when used in conjunction with the title of a rank of the Uniformed Force shall mean that the Member so designated is temporarily assigned to perform the duties of the next higher rank.

APPARATUS QUARTERS: That portion of Company Quarters wherein the apparatus is housed, and does not include the living quarters, where such are situated at the rear of apparatus and separated therefrom by a partition.

CHIEF OFFICERS: Chief of Department, Deputy Chief(s) and Acting Officers while serving in any of the foregoing ranks.

CIRCULAR: Information issued by the Commissioner of Public Safety or the Chief of Department to the entire personnel of the Department, or to any group thereof.

COMMUNICATIONS: Interchange of official correspondence or messages.

COMMANDING OFFICERS: Chief Officers and Lieutenants who are charged with the administrative duties in their respective Units.

COMPANY COMMANDERS: Lieutenants charged with the administrative duties, as provided for in Section 72 of these rules.

FIRST DUE: Any Unit that is assigned to arrive first at a fire or signal station.

GENERAL ORDERS: Printed orders usually of a permanent character which require the attention of the Department. General orders are numbered.

14

LIGHT DUTY: Members recommended for light duty by the Department Physician shall perform any following duties: Theatre Duty, Housewatch Duty, Messenger Duty, Building Inspection, Hydrant Inspection, Clerical Duty, Committee Work, Switchboard Attendant, or such other duties as may be recommended by the Department Physician.

MEMBERS: The term "Members" includes all Members of all ranks and grades in the Uniformed Force.

OFFICER IN COMMAND: The Officer or Acting Officer on duty and in immediate command of one or more Department Units.

OFFICIAL CHANNELS: The forwarding or transmitting of official communications through Intermediate Officers in ascending or descending order of rank.

QUARTERS: Any Fire Station or Department building wherein fire apparatus is housed and/or Members are assigned for duty.

SENIOR OFFICER IN RANK: An Officer of any rank who has served the longest period of time in such rank.

SPECIAL ORDERS: Printed orders, usually temporary in character, which affect the Uniformed Force or the operation of one or more Units thereof.

VOCAL ALARM: Any Alarm transmitted from the Fire Alarm Dispatchers office and received in Fire Stations and Police Headquarters over the closed vocal alarm system.

TOURS OF DUTY: Shall be as set forth in the current contract.

CURRENT CONTRACT: Agreement made and entered into by and between the City of White Plains and the Professional Fire Fighters Association, Inc., Local 274, I. A. F. F., City of White Plains.

52

governed by the customary rules of good behavior observed by law-abiding and self-respecting citizens. In all cases where Members conduct themselves in a manner which may bring reproach or reflect discredit upon the Department, charges shall be preferred.

SEC. 129.  MEMBERS SHALL:

1. Devote their whole time on duty to the work of the Department.

2. Reside within the legal residence requirements as established by the City of White Plains.

3. Promptly notify the Fire Alarm Dispatcher or Deputy Chief on duty of any inability to report for duty at the time or place required.

4. Be courteous and respectful at all times.

5. Always present a neat and well-groomed appearance.

6. Be responsible for the safekeeping of all Department property entrusted to their care.

7. Promptly report the loss of any badge, device, equipment or book of Rules and Regulations, or other Department property.

8. Use every precaution to avoid damage or injury, when engaged in performing committee work in or about Company quarters.

9. Promptly report all accidents involving damage to motor vehicles in connection with the operations of the Department.

10. Promptly notify the Officer in Command of their Unit of any matter coming to their attention which may affect the interest or welfare of the Department.

11. Promptly report to the Officer in Command of their Unit any fire of which they may hear, other than those regularly reported, no matter by whom extinguished, or how trifling the damage.

12. Thoroughly familiarize themselves with these Rules and Regulations and amendments thereto, as well as instructions affecting the operations of the Department.

SEC. 130. MEMBERS SHALL NOT:

1. Violate their oath of Office.

2. Neglect nor shirk any duty.

3. Engage in another business or employment, except with the knowledge and consent of the Chief. Any member of the Department desiring to take part in secondary employment at any time, shall submit the required Outside Job Report to the Chief of Department. Approved requests for secondary employment will be valid for a period of one year, and only for the specified employment on request. Engaging in such employment after the expiration date of the request will be considered a violation of procedure. Approved secondary employment requests may be cancelled at any time by the Chief of Department.

4. Absent themselves from quarters, fires, nor from any other assignment of duty, without permission of the Officer in Command.

5. Indulge in the use of drugs or narcotics, except with the Written approval of the Department Physician.

6. Indulge in, nor be under the influence of liquors or beverages, nor drugs or compounds, while on duty.

EXHIBIT "F"

CITY OF WHITE PLAINS
DEPARTMENT OF PUBLIC SAFETY

----------------------------------------------------------x

In the Matter of Certain Disciplinary Charges
Preferred by Frank G. Straub, Commissioner,
Department of Public Safety

                    **AMENDED
HEARING OFFICER'S
REPORT AND
RECOMMENDATIONS**

                    Charging Party,

         -against-

Lieutenat Kevin Heffernan

                    Charged Party.

----------------------------------------------------------x

To:    Frank G. Straub, Commissioner
       City of White Plains
       Department of Public Safety

ROBERT J. PONZINI, as Hearing Officer herein, presents his report and recommendations:

1. Notice of Charges against the respondent were duly served upon him by personal service on July 31, 2005.

2. Said charges, dated July 29, 2005 consist of seven (7) charges and seven (7) specifications of misconduct and/or incompetence alleging that the respondent while employed by the City of White Plains Department of Public Safety ("Department") in his capacity as a paid fireman with the rank of lieutenant:

      Charge 1:  Violation of Section 91 of the Department of Public Safety Rules and Manual of Procedures:  Section 91 – They [Company Commanders] shall be responsible for the strict enforcement of every order, rule, or regulation affecting their respective company.

      Specification 1:  In that on or about April 20, 2005, you failed to prepare Tower Ladder 6 for response in a timely fashion after receiving orders from Deputy Chief Vincent Roberto to make your company available.

      Charge 2:  Violation of Section 129, subsection 3 of the Department of Public Safety Rules and Manual of Procedures.  Section 129(3)

Members shall promptly notify the fire alarm dispatcher or Deputy
Chief on duty of any inability to report for duty at the time or place
required.

Specification 1:  In that on or about April 20, 2005, you failed to notify
The dispatcher on duty of any inability to prepare Tower Ladder 6 for
Response in a timely fashion after receiving orders from Deputy
Chief Vincent Roberto to make you company available.

Chager III:  Violation of Section 130, Subsection 2, of the
Department of Public Safety Rules and Manual of Procedures.
Section 130(2):  Members shall not neglect or shirk any duty.

Specification 1:  In that on or about April 20, 2005, you failed to
prepared Tower Ladder 6 for response in a timely fashing after
receiving orders from Deputy Chief Vincent Roberto to make
your company available.

Charge IV:  Violation of Section 130, Subsection 4, of the
Department of Public Safety Rules and Manual of Procedurs
Section 130(4):  Members shall not absent themselves from
quarters, fires, nor from any other assignment of duty, without
permission of the officer in command.

Specification 1:  In that on or about April 20, 2005, you failed to
prepare Tower Ladder 6 for response in a timely fashing after
receiving orders from Deputy Chief Vincent Roberto to make
your company available.

Charge V:  Violation of Section 126 of the Department of Public
Safety Rules and Manual of Procedures.  Section 126:  members
shall obey all laws, rules and regulatlions, orders and commands.
such obedience shall be prompt, implicit and unqualified.

Specification 1:  In that on or about April 20, 2003, you failed to
prepare Tower Ladder 6 for response in a timely fashion after
receiving orders from Deputy Chief Vincent Roberto to make
your company available.

Charge VI:  Violation of Section 128 of the Department of Public
Safety Rules and Manual of Procedures.  Section 128:  In all
cases when members conduct themselves in a manner which
may bring reproach or reflect discredit upon the department,
charges will be preferred.

Specification 1:  In that on or about April 20, 2005 at approximately

2

1:47 p.m., you made an inappropriate radio transmission advising Rose Street command that drill school companies are fatigued during a working fires. This charge was withdrawn by City Commissioner Straub at the commencement of the hearing.

Charge VII: Violation of Section 174 Responses to Alarms shall Be made with all proper dispatch, consistent with public safety.

Specification 1: In that on or about April 20, 2005, you failed to prepare Tower Ladder 6 for reponse in a timely fashion after receiving orders from Deputy Chief Vincent Robert to make your company available.

3. Hon. Frank G. Straub, Commissioner, Department of Public Safety, by letter dated December 13, 2005, designated me to be the hearing officer pursuant to Section 75 of the Civil Service Law. I was directed to submit my findings and recommendations to him together with the records and exhibits, for his review and determination.

4. Hearings were held before me at the public offices of the City of White Plains on December 13, 2005, January 23, 2006, May 8, 2006 and June 16, 2006. Present were the Respondent, Lieutenant Kevin Heffernan, his attorney, Jonathan Lovett, Esq. and Daniel K. Spencer, Esq., Deputy Corporation Counsel for the City of White Plains. Officials from the City of White Plains Fire Department and the Department of Public Safety, together with union and fire department members also observed the proceeding from time to time.

5. Among the witnesses called by the Petitioner were: a) Deputy Fire Chief Vincent Roberto ("Roberto") ; b) Lieutenant Timothy Ryan, Jr. ("Ryan") ; c) Deputy Chief Richard Houlihan ("Houlihan"); d) Fire Chief Richard Lyman ("Lyman"). The Respondent called as witnesses: a) ;Fire Lieutenant Lawrence Toglia ("Toglia"); b) Fire Lieutenant Paul Fiorisi ("Fiorisi"); c) Firefighter Joseph Carrier ("Carrier"); d) Firefighter Anthony Evangelista ("Evangelista"); e) Firefighter Brian McGarvey ("McGarvey"); f) Firefigher Owen McCoy ("McCoy"); g) Firefigher Waren Fargo ("Fargo"); g) Firefighter James W. Russell ("Russell"); h) Firefighter Jeffrey Faulkner ("Faulkner"); h) Firefighter Canute Hibbert ("Hibbert"); I) Deputy Chief Vincent Robert ("Roberto") The Respondent did not testify in defense of the charges as part of his case.

6. Annexed hereto and made a part of hereof are the stenographic transcript of the minutes and the exhibits admitted into evidence. The exhibits consist of three (3) Hearing Officer Exhibits, five (6) Department Exhibits. The Respondent submited Exhibit "A". Rather than list each exhibit individually they are specified in the appendix of the transcript and are incorporated herein by reference. Counsel for the Petitioner and the Respondent submitted closing briefs which have been reviewed and considered for the purposes of this report.

## PRELIMINARY RULINGS:

     7. As Hearing Officer herein, I charge myself with the following principles of law to be utilized with others in the report and recommendations for these specifications.

     It is well established that the courts will not interfere with an administrative determination after a disciplinary hearing if the determination is supported by substantial evidence. Pell v. Board of Education of Union Free School District No. 1 of the Towns of Scarsdale and Mamaroneck, 34 N.Y.2d 222, 230-31; 356 N.Y.S.2d 833 (1974). The hearing officer should consider the totality of the evidence and all reasonable inferences to be drawn therefrom. Moorehead v. Langloh, 145 A.D. 2d 777, 778, 537 N.Y.S.2d 258 (2d Dep't 1989). "The New York State rule has long been that whether evidence is substantial is to be determined 'in light of the record as a whole' (citations omitted)" Kelly v. Murphy, 20 N.Y.2d 205, 209; 282 N.Y.S.2d 254 (1967). Substantial evidence is "when the proof is 'so substantial that from it an inference of the existence of the fact found may be drawn reasonably' (citations omitted)." 300 Gramatan Avenue Associates v. State Division of Human Rights, 45 N.Y.2d 176, 408 N.Y.S.2d 54 (1978)

     A hearing officer is further charged with the responsibilty of making judgments with regard to a witness's credibility. The Court of Appeals has stated that "a hearing officer's report is entitled to weight, at times variously stated to be 'much, 'considerable', or the 'greatest', in determining the existence of substantial evidence, particularly to the extent that material facts in a given case may depend on resolving the credibility of witnesses as shown by their demeanor or conduct at the hearing." Simpson v. Wolansky , 38 N.Y.2d 391, 394; 380 N.Y.S.2d 630 (1975). The Court of Appeals in Kelly, supra at 210, quoting, Universal Camera Corp. v. Labor Board, 340 U.S. 474, 493: 71 S.Ct. 456 (1951), stated " the trial examiner's report is entitled to weight in determining the existence of substantial evidence particularly 'to the extent that material facts in any case depend on the determination of credibility of witnesses as shown by their demeanor or conduct at the hearing.'"

     The Respondent herein is a Lieutenant in the City of White Plains paid fire department with approximately nineteen years (19) years of experience. It is alleged in sum and substance that he neglected his responsibilities as a supervising fire officer/company commander when he failed to respond in a timely manner to multiple commands from his superior officer to make his company available for a fire alarm. At the time those orders were issued, the issuing officer was responding to a fire at a residence with a heavy smoke condition. The conditions at this fire scene required the officer at that scene to order the companies at the fire training center, including the respondent's, to make themselves available. Shortly thereafter, as the situation developed, the incident commander at the fire scene again, in more urgent terms, ordered the

fire companies at the fire training center to make themselves available as soon as possible. This order was again reinforced by the fire dispatcher who also told the companies at the fire training center, which included the respondent, to make themselves available.

Approximately one half hour later, a third order was given by the incident commander to the respondent at the fire training center, ordering him to "drop all hose line" at the drill school, lock the gates and report to Station 2. After this third order, another seven (7) minutes elapsed before the respondent reported that his company Tower Ladder Six was available.

## FINDINGS OF FACT;

For organizational purposes, the City of White Plains Fire Department ("Department") is organized into five (5) Groups. Four of the groups work in shifts providing fire protection 24 hours a day, 365 days a year. The fifth group works steady days and is primarily responsible for fire prevention and training. These five groups are all led by a Deputy Chief. The Deputy Chief in charge of the on duty group is responsible for all fire fighting and activities, most importantly, the response to fire alarms.

On April 20, 2005, deputy Chief Richard Houlihan was the Deputy Chief in Charge of the Fire Prevention and Training Group and during the time of the charges herein, Deputy Chief Vincent Roberto was in charge of the Department's fire fighting responsibilities. On April 20th, there were five engine companies, three ladder companies and one rescue company on duty. Four of the nine companies on duty that day, including respondent's Tower Ladder 6, and a contingent from the New Rochelle Fire Department, were engaged in live fire training at the Department's drill school, located within the City of White Plains (Tr. 46)

The purpose of live fire training is to simulate actual fire fighting conditions. Training is conducted pursuant to the Department's guidelines for "Live Fire Training Evolution" in a limited, familiar environment, a fire proof structure designed specifically for training but without all the usual unkown dangers faced in response to an alarm. While realistic, the training is designed to be somewhat less strenuous than an actual fire ( Dept. Ex. 2).

On April 20, 2005, the live fire training consisted of two evolutions during which some of the fire fighting personnel entered the simulated burn building where training fires were set. Between each fire exercise, there is a break period to allow the firefighters to cool down, hydrate and critique the exercise. Just as the last exercise was completed, an alarm was sounded with a report of "heavy smoke conditions form the rear of the house" at 10 Rose Street. Roberto testified that the alarm was significant and required a larger response, "a full

5

assignment", because heavy smoke was reported coming from a residence (Tr. 14, 48 and J"1" and J "7")

Roberto, determined that all the available units that were not at the Department's training facility should be part of the initial response to the Rose Street alarm and ordered the companies at the drill school (including the respondent's) to make themselves available. (Tr. 15, 29, 30, 45, 53-54 and J "1" and J "7")  This order was issued <u>two minutes</u> after the Rose Stree alarm was sounded (J "1"). Roberto issued the command as he was leaving headquarters en route to the fire (Tr 15).

The order for the companies to make themselves available at the training school was <u>acknowledged</u> by Houlihan, the officer in charge. (Tr. 36, 92 and 361 and J "1" and J"7")

Personnel participating in the drills at the training school were informed of the working fire by radio.  They were also informed by Houlihan and Training Officer Ryan. (Tr 161).  Houlihan testified that he personally told the firefighters and officers at the training school that "We got to get ready fellas, it looks like they got something" (Tr 135, 161).  He further testified that the equipment that had to be returned to the engines and trucks included hand tools, Scott bottles and hand lines. (Tr. 137) and that he did not believe any of Tower Ladder 6's hose (Respondent's company) was used during the training.  Chief Lyman testified specifically regarding Tower Ladder 6, that hand tools, a rope a ground ladder and Scott Packs had been removed for the training exercises (Tr 170).

A contingent from the City of New Rochelle fire department was also involved in the training exercises.  They were asked to assist in removing the five inch supply line hose which had been connected in such a way that it might block the fre apparatus from leaving the facilitiy (Tr 93-94, 111, 134, 135,  and 142)

Engine 67 was the apparatus most ready to be returned to service.  Lieutenant Ryan and Houlihan agreed that it would expedite the response if personnel assigned to Engine 65, which had been the designated rescue team and, therefore the least physically taxed personnel, were switched with the crew assigned to Engine 67 (Tr 75-79, 85-86. 93-94, 143-144)

<u>Six minutes</u> after first ordering the companies at the drill school to make themselves available , Roberto commanded that the units at the drill school become available <u>as soon as possible</u>.  This second order was more urgent and relayed by the dispatcher and acknowledged by Houlihan (tr. 21 and J "1" and J "7".  The dispatcher advised Roberto that Engine 67 and Unit ladder 34 were going to be en route and Roberto ordered that those two companies relocate and stand by at Station 6 (J "1" and J "7").

After directing the crew of Engine 65 to switch to Engine 67, and the five inch supply line was removed, Ryan departed the training school to serve as designated incident safety officer at the Fire scene (Dept. ex 2).

Eleven minutes after the Rose Street alarm sounded and nine minutes after Roberto gave his first order to the training center, Ladder 34 reported it was relocating to Headquarters Station 6. No more than two minutes later, 11 minutes after the first order, Engine 67 reported that it was available en route to Station 6 ( J "1 and J "7")

Houlihan testified that the eight to nine minutes it took until Engine 67 and Ladder 34 became available was the time required for those two companies to get their Scott bottles and other gear back on the rigs. (Tr. 144).

When cross examined, Houlihan testified that it only took six or seven minutes for the New Rochelle personnel to disconnect and move enough of the five inch supply line so that it no longer blocked the drill school's exit, and that once the five inch supply line was removed, every company could have responded. Houlihan further testified that he noticed some personnel re-packing hose and he told them "Just cut the hose and let's go fellas." That meant disconnect the hose and just leave it there. (Tr. 146).

Lastly, Houlihan testified that when he left the drill school, the remaining White Plains fire companies, Engine 65 and Tower Ladder 6, were ready to be in service, stating that " he didn't view anything that showed that they were not going to be able to respond." He concluded that when he left the drill school, Engine 65 and Tower Ladder 6 should have been able to respond in a more timely fashion (Tr 151 and 153). When asked specifically what remained to ready Tower Ladder 6 to go back in service as he was leaving the training facility, Houlihan stated , "Nothing visually that I could see." (Tr. 155).

After Engine 67 and Ladder 34 left, and after Houlihan was satisfied Engine 65 and Tower Ladder 6 were ready, he told the dispatcher that he would handle all new alarms. This is a procedure that allows the incident commander, in this case Roberto, concentrate on the alarm. Houlihan then left the training facility for headquarters (Tr. 134-135, and Dept. Ex 2).

Roberto, concerned that Engine 65 and Tower Ladder 6 were still available, twenty minutes after the alarm, told dispatch to have Engine 65 report to the Rose Street fire as soon as the company was available (Tr. 43).

Thirty minutes after Roberto first ordered the companies at the training school to make themselves available, the dispatcher asked Engine 65 if they are "enroute to the scene [Rose Street]. Engine 65 responded they were still at the training center and unavailable, Robert then directly ordered the Respondent to drop the hose lines at the drill school, lock the gate and report with Engine 65 to Station 2 (J "1" and J "7")

Roberto testified that he ordered Tower Ladder 6 to "drop the hose lines" after hearing that Engine 65 was still "unavailable" Roberto wanted someone back at the firehouse that would be able to answer an additional alarm if necessary (Tr 29).

Two minutes later, the dispatcher asked both Engine 65 and Tower Ladder 6 if they were back in service. Both companies answered in the negative. The respondent stated tht they "would be back in service shortly (J "1" and J "7")

Shortly thereafter, the respondent reported to dispatch and advised that the four companies at the drill school were fatigued.

Thirty seven minutes after Roberto first ordered the compaines at the drill school to make themselves available, the Respondent was finally in compliance. Engine 65 had done so two minutes earlier.

Chief Lyman testified and essentially repeated the time line above, Lyman testified that the disciplinary charges herein were filed "based upon the fact that 37 minutes, in my 30 years of experience, is way too long to get out of drill school when given an order by a Deputy Chief to make yourself available" (Tr 170)

Lyman further testified that, as a result of his investigation, he was informed by one of the firefighters that when the first company left the drill school, most of the equipment, including the ground ladder was already back on Tower Ladder 6 Tr. 170)

The respondent, in support of his case, entered the testimony of varous fire department personnel who had participated in the events of April 20th.

Lieutenant Toglia testified that he and New Rochelle Fire Captain Benz were responsible for ensuring that the training fire in the burn building was completely extinguished. Totglia stated that he and Benz experienced some difficulty in extinguishing the training fire. Once that task was successfully accomplished, Engine 65 and Ladder 34 had already left the drill school (Tr 214-216). Toglia stated that his crew had been exchanged and he was now responsible for Engine 65. He observed that the New Rochelle personnel and the remaining White Plains personnel were breaking down and dragging the hose. (T 220). Toglia testified that he was also disciplined on the same grounds as the respondent but, in lieu of a hearing, entered a stipulation and received a three day suspension.

Union President Carrier testified that he discussed with Commissioner Straub, the possibility of resolving the disciplinary charges against both Toglia and the respondent. Carrier testified that the respondent was offered a ten day suspension and Toglia was offered a five day suspension. The respondent did not accept the offer (Tr 273-274).

Respondent alleges as part of his case that he was concerned about the physical condition of the firefighters under his command and that they might be fatigued.

8

In that regard Lieutenant Fiorisi testified that he was concerned about the physical condition of those under his command. He stated that his men approached him and said they were exhausted. He did not report this to the training officer or the Deputy Chief but rather to the respondent. The Respondent directed Fiorisei to Houlihan and he testified that he reported his men were not ready to go back into service. (Tr. 252-255)

When cross examined, Fiorisi stated that his men did not indicate that they were suffering any of the indications of heat exhaustion and also he did not include this complaint in the report he filed with respect to this incident (Tr 267-270, J "2").

Firefighters Evangelista and McGarvey testified on behalf of the respondent but did not have any concerns about their fitness. Nor did they include any mention of it in their reports. (Tr. 280-295, J "2"). Evangelista even volunteered "I was ok at the time" (Tr 288). McGarvey specifically testified that nothing was mentioned to anyone about his physical condition (Tr. 293)

Firefighter McCoy, under the direct command of the respondent, testified that all of the equipment removed from Tower Ladder 6 and used during the live fire training was on a tarp and marked as belonging to the truck (Tr 301-303). He testified that Tower Ladder 6' tower was not deployed during the drill and that on the day in question, the respondent told him to "load the hose". (Tr. 310).

Firefighter Warren Fargo testified he spent his time repacking the hose after the receipt of the Rose Street alarm. (Tr. 316). Firefighter Faulkner, part of Toglia's crew acknowledged he heard Roberto's order to "make themselves available" and continued to repack hose.

**CONCLUSIONS:**

I have listened to the testimony and observed all of the witnesses. The charges and specifications involve conduct of the respondent, in a leadership position, wherein he failed to prepare the company under his command for response in a timely fashion to a direct order, given by a superior officer, not once, but on three separate occasions.

The time line is clear and evidence is substantial and undisputed. The recording of the radio communications relating to the Rose Street fire, and the transcript of the recording, establish that it took thirty seven (37) minutes from the time Deputy Chief Robert first ordered the companies at the training school to make themselves available until the respondent's company was finally made available. Chief Lyman was unequivocal in his testimony. Thirty seven minutes "is way to long to get out of drill school when you've been given an order to make yourselves available (Tr. 168, J "1' and J "7"). The respondent's position is really one of confession and avoidance. There is an almost aknowledgement in the record that all of the transmissions were received and appropriate to the circumstances the department found themselves in. Respondent argues that,

irrespective of those three (3) separate orders, he was legitamtely delayed in responding because his men were fatigued and not ready for service and that the facility was somewhat blocked by hose hook ups and further that tools needed to be replaced.  This flies in the face of even the testimony of his own witnesses.  There is no justification in the record for the failure to respond in a timely manner, not once, not twice, but three times.

Lastly, if the respondent was concerned about the inability of his company to make themselves available, the record is devoid of any evidence that he attempted to contact the dispatcher or Deputy Chief Roberto with those concerns.  It was not until 35 minutes ater the Rose Street alarm and 33 minutes after Roberto's first command that the respondent finally asked the dispatcher to "advise Rose Street Command(Roberto) that the four companies located at the White Plains Drill School are fatigued." (J "1" and J":7").

Even to the untrained layperson, it obvious and apparent that in firefighting timing and quick response are essential.  Any delay, whether well intentioned or not, can be destructive to property and fatal to human life.  There is no justification in the record to sustain the conduct on the respondent in not promptly following the direct order of his legitimate superior, especially in response to a fire emergency.

I have reviewed the request of the the Department to draw a negative inference based upon the decision of the respondent not to testify.  While their legal position is well founded and as hearing officer I believe that I am entitled to do so, I will exercise my discretion and decline to do so in this instance.

## DECISION:

I have listened to the testimony, observed the witnesses and weighed their credibility.  I have reviewed the exhibits and the record as a whole.  I find the testimony of the witnesses for the Department to be both compelling and professional.  I have considered all of the arguments of the Respondent, both legal and factual, including any claims for selective prosecution.  I find the record devoid of facts that would sustain such a defense to any degree.

Therefore, based upon all of the foregoing, I find that the allegation contained in Charges I, II, III, IV, V, and VII and the Specifications therein have been sustained in all respects by substantial evidence.

## RECOMMENDATION AS TO PENALTY:

11.  At the outset I would like to state that I have reviewed the Brief prepared by Respondent's  and Petitioner's counsel in this matter and I am aware of the factors set forth in the seminal case, Matter of Pell v. Board of

Education, 34 N.Y. 2d 222 (1974), and have taken note of the following, to the
extent that they have been provided to me, among others:

    a) Length of employment

    b) Prior disciplinary history, if any

    c) Prospects for future employment

    d) Loss of future benefits

    e) Impact on Respondent's family

       I have also taken into account the more recent decisions in Waldren
v. Town of Islip, 18 A.D.3d 566 (2d Dept., 2005) and Muraik v. Landi, 2005 WL
1531922 (2d Dept., June 27, 27, 2005).

The respondent is a firefighter with over nineteen (19) years of experience in the
White Plains Fire Department.  I have not been provided any evidence or
indication that he was the subject of any prior disciplinary proceeding or proof of
same.  He is a fire officer in a noble profession, a position of great trust, a person
who the people of his community rely upon for their safety and well being.  With
no evidence to the contrary, he has rewarded that trust up until the time of these
charges.  However, that being said, these charges are serious breaches of that
trust.  Minutes can mean lives – either of the citizens of White Plains or even his
fellow fire officers.  His conscious delay in following the orders of his direct
superior is inexcusable.  It is appropriate that some penalty be imposed and in
this particular instance, it is my recommendation that the respondent be
suspended for a period of thirty (30) days.

In my judgment this is a fair and just penalty under all of the circumstances
herein.

Dated:   April 23, 2007

       White Plains, New York

                           Respectfully submitted,

                           Robert J. Ponzini, Hearing Officer

11